UNITED STATES DISTRICT COURT                              NOT FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROBERT L. GELTZER, as Trustee of the Estate of the          :
Debtors, IGOR MANRIQUE and ANDREA PRYOR,                    :
                                                            :
                            Plaintiff,                      :     MEMORANDUM & ORDER
                                                            :
            - against -                                     :     No. 09-CV-3865 (ERK) (MDG)
                                                            :
J.B. HUNT TRANSPORT, INC.,                                  :
                                                            :
                            Defendant.                      :
------------------------------------------------------------------X

KORMAN, J.:

        Igor Manrique ("Manrique") and his wife, Andrea Pryor ("Pryor"), (collectively, the

"plaintiffs") filed a lawsuit against Manrique's former employer, J.B. Hunt Transport, Inc. ("J.B.

Hunt"), a trucking company, after Manrique was terminated for violating company policy and

this fact was subsequently included in his employment report.[1]   Specifically, the plaintiffs

brought claims for (1) negligence, (2) breach of the implied duty of good faith and fair dealing,

(3) defamation, and (4) tortious interference with contract.  J.B. Hunt now moves for summary

judgment.

                                          FACTS

I.  The Accident, Phone Calls, Drug Test, and Termination

        On the night of May 5, 2008, Manrique, a tractor trailer driver employed by J.B. Hunt,

was injured by the trailer door of a parked truck.[2]  [Def.'s R. 56.1 Stmt. ¶ 1; Pls.' R. 56.1 Stmt.

¶¶ 1-2, 5-6; Manrique Dep. at 107.]  As Manrique explained it, the trailer door did not close

---

[1] Manrique and Pryor's Chapter 7 trustee, Robert L. Geltzer, has been substituted as the named plaintiff, but I will
nevertheless refer to Manrique and Pryor as the "plaintiffs" throughout this opinion.
[2] Manrique had previously been employed by J.B. Hunt on two earlier occasions: in July 2007 and again in August
2007.  [Manrique Dep. at 74-75.]  His third and most recent period of employment with J.B. Hunt began in
September 2007.  [Pls.' R. 56.1 Stmt. ¶ 3; Manrique Dep. at 99.]  During this third stint, Manrique was working out
of a location in Elizabeth, New Jersey.  [Manrique Dep. at 105-06.]

properly, so he used extra force to reopen it so that he could try closing it again.  [Manrique Dep. at 107.]  Because of this extra force, however, the handle came out of place and hit Manrique in the face.[3]  [Manrique Dep. at 107.]  Manrique was knocked unconscious and taken by ambulance to the Robert Wood Johnson Hospital in New Brunswick, New Jersey.  [Pls.' R. 56.1 Stmt. ¶ 7; Def.'s R. 56.1 Stmt. ¶ 2; Manrique Dep. at 106, 108-09; Ex. P.]  When Manrique woke up, he was in the Emergency Room being told that he was getting a few stitches in his mouth and that he had small cuts on his face, upper lip, and gums.[4]  [Manrique Dep. at 106.]  Manrique was prescribed painkillers for these injuries.  [Manrique Dep. at 110.]

At 1 or 2 a.m. on May 6, 2008, Manrique was discharged from the hospital and was picked up by his wife, Pryor.  [Manrique Dep. at 109, 111; Pryor Dep. at 29-30.]  Manrique and Pryor got in their car, and, while still parked in the hospital parking garage, Pryor called J.B. Hunt's Corporate Safety Department, using a 1-800 number that was on a label that someone at the hospital had taped to Manrique's arm.  [*See* Manrique Dep. at 106, 111, 112-13, 114-15; Pryor Dep. at 29-30.]  Manrique had been told to call this number "as soon as possible." [Manrique Dep. at 112-14.]  During Pryor's conversation with J.B. Hunt, she was told that Manrique had to take a drug test the following morning—that is, the morning of May 6, 2008— and that the drug test would take place near their home in Jackson Heights in Queens, New York.[5]  [*See* Manrique Dep. at 115; Clarke Dep. at 19; Pryor Dep. at 30-31; Ex. P.]  Pryor was also told that Manrique should call J.B. Hunt in the morning to get the address of the drug testing site.  [*See* Manrique Dep. at 125; Pryor Dep. at 31.]  According to Manrique, Pryor was not told

---

[3] Manrique alternatively described this incident like so: "[M]y truck was parked and I was opening a door to the trailer when the door suddenly sprung open, striking me in the head."  [Manrique Aff. ¶ 6.]  Richard Nickell, one of the first J.B. Hunt employees notified of the incident, recalled "that [Manrique] was hit either in the face or the mouth area with a trailer door."  [Nickell Dep. at 6; *see also* Ex. P attached to Def.'s Mem. of Law ("Ex. P").]

[4] According to his wife, Manrique sustained a concussion as a result of this accident.  [Pryor Dep. at 41.]

[5] Manrique was not drug tested at the hospital because the hospital did not have J.B. Hunt's chain of custody forms. [Clarke Dep. at 22; Ex. P.]

that Manrique had to take the drug test immediately. [Manrique Dep. at 125.] Manrique testified that it was 4 a.m. by the time he and his wife got home that night. [Manrique Dep. at 109-10.]

The morning of May 6, at around 9 a.m., Manrique called J.B. Hunt from his home and spoke to Kim Clarke ("Clarke"), a worker's compensation examiner who works in J.B. Hunt's Corporate Safety Department.[6] [Manrique Dep. at 116; Clarke Dep. at 5, 8.] Clarke told Manrique that he had "to go and take the drug test immediately or [he would] be terminated." [Manrique Dep. at 116.] In discovering that his drug test would take place in New Jersey, Manrique explained to Clarke that his wife had been told the drug test would take place near his house in Queens. [*See* Manrique Dep. at 116; Ex. P.] Clarke told Manrique that she would call him right back.[7] [Manrique Dep. at 116.]

Forty-five minutes later, around 10 a.m., Clarke called Manrique and told him that the only drug testing site available was in Hoboken, New Jersey.[8] [Manrique Dep. at 116.] Manrique explained that Hoboken was a bit far for him and that he was unable to drive at that moment. [Manrique Dep. at 116.] Clarke responded that there were no sites available near his house and that the closest testing site was in Jersey City, New Jersey. [Manrique Dep. at 116.] Manrique then asked if he could wait until his wife got back from work "because [he did not] feel completely a hundred percent to go by [himself] on the train."[9] [Manrique Dep. at 116-17.]

---

[6] Clarke was the first person at J.B. Hunt with whom Manrique spoke after the accident. [Manrique Dep. at 111-12, 114.] There are some discrepancies between Clarke's and Manrique's version of how these conversations unfolded and what exactly was said. Because of the procedural posture of this case, I resolve all ambiguities and reasonable inferences in the plaintiffs' favor. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam).

[7] J.B. Hunt uses a third-party company to set up drug tests, and this is who Clarke was calling to check if the drug testing site could be changed. [Nickell Dep. at 9; Dunn Dep. at 10-11; Ex. P.]

[8] According to Clarke's version of events, this 10 a.m. conversation and the previously described 9 a.m. conversation were one single conversation. [Clarke Dep. at 8-11.]

[9] Clarke denies that Manrique relayed to her his transportation difficulties and his wife's being at work. [Clarke Dep. at 19-20.] In J.B. Hunt's Safety Department Safety Event Maintenance reports, however, there is

3

Clarke responded by telling Manrique that, if he did not go take the drug test "immediately," he would be terminated.  [Manrique Dep. at 117.]  Manrique testified that Clarke then hung up.  [Manrique Dep. at 117.]  Manrique also testified that, when he was notified that his drug test would be in New Jersey, he "had no transportation to New Jersey, had been awake since the middle of the previous night, and had been on medication."  [Manrique Aff. ¶ 14.]  And Clarke testified that, during this conversation, Manrique was "argumentative."  [Clarke Dep. at 8.]

According to Manrique, he then called Clarke back and asked her why she had hung up on him.  [Manrique Dep. at 117.]  Clarke responded, "I told you right away what you have to do."  [Manrique Dep. at 117.]  Manrique then said to her, "[L]isten, I am just asking you to give me time until my wife comes back from work, because I don't feel right to go by myself on the train."  [Manrique Dep. at 117.]  As Manrique explained it, Clarke then got upset, told Manrique that she did not care what happened to him, that she did not believe his version of events, and that she thought Manrique had been involved in a fight.  [Manrique Dep. at 117.]  Clarke then hung up.  [Manrique Dep. at 117.]

Manrique then tried calling his wife, but she was at work.  [Manrique Dep. at 117.]  He also tried calling J.B. Hunt in Elizabeth, New Jersey, but no one could help him out.  [Manrique Dep. at 117-18.]  Manrique then called Clarke back to tell her that he could not go by himself to take the drug test.  [Manrique Dep. at 118.]  Clarke responded, "I told you right away what you have to do.  You have to take the drug test immediately or you [will] be terminated."  [Manrique Dep. at 118.]  Manrique then said, "[O]kay, let's do this.  I am going to take the fucking drug test right now.  As soon as I take the drug test, I quit this company, because I don't need this

---

documentation that Manrique did tell someone at J.B. Hunt that his car was in New Jersey and did ask if he could wait until his wife got home from work at noon or 1 p.m., at the latest.  [Ex. P.]  But this entry in the report is signed by the initials "AHI"—rather than the initials "KC," as the remaining entries are—which raises the possibility that Manrique gave this explanation regarding his transportation difficulties to someone other than Clarke.  [Ex. P.]

bullshit."[10]  [Manrique Dep. at 118.]  Clarke hung up again.  [Manrique Dep. at 118.]  According to Clarke, Manrique said that he was "going to quit J.B. Hunt" and that "he didn't need this shit" and then hung up on her.[11]  [Clarke Dep. at 10, 20.]  Manrique testified, however, that he never told Clarke "I quit right now."  [Manrique Dep. at 127.]  According to Manrique, he never actually quit his employment with J.B. Hunt.  [Manrique Aff. ¶ 27.]

Manrique then called Clarke back and again said, "[L]isten, I just want you to give me time until my wife comes back [from] work and I go to take the drug test."  [Manrique Dep. at 118.]  Clarke again responded, "[I]f you don't go to take the drug test immediately, you will be terminated," and hung up.  [Manrique Dep. at 118.]  During one of these conversations, Manrique told Clarke that he was going to go to the Labor Department.  [Clarke Dep. at 9; Manrique Dep. at 127.]  Clarke did not respond to Manrique's Labor Department comment, but rather, repeated that he had to go get drug tested "immediately," that it was "company policy," that it was "mandatory," and that he should call her when he arrived at the testing site.  [Clarke Dep. at 9, 11, 23.]  According to Clarke, Manrique then told her to "fuck [her]self," and she hung up on him.  [Clarke Dep. at 10-11.]  Manrique, however, denies telling Clarke to go fuck herself.[12]  [Manrique Dep. at 127.]

At 11:45 a.m., Manrique arrived at Concentra Medical Center ("Concentra") in Jersey City.  [*See* Manrique Dep. at 118.]  To get there, Manrique took three trains and a taxi.  [Manrique Dep. at 130.]  Manrique then called Clarke to tell her that he had arrived at the drug testing center.  [Clarke Dep. at 12-13.]  According to Manrique, Clarke responded sarcastically,

[10] During his deposition, Manrique gave two slightly different formulations of what he said: (1) "[A]s soon as I take this fucking drug test, I'll quit this company, because I don't need this bullshit," and (2) "[A]s soon as I take the fucking drug test, I am going to quit, because I don't need this bullshit."  [Manrique Dep. at 122, 127.]  Manrique also admitted that he had said that he "did not have to take this shit."  [Manrique Dep. at 127.]
[11] Manrique testified that he never hung up on Clarke; rather, it was Clarke who repeatedly hung up on him.  [*See* Manrique Dep. at 120-21, 127-28.]
[12] Clarke's notes in J.B. Hunt's Safety Department Safety Event Maintenance report, however, state, "TOLD ME TO FU** MYSELF, I THEN DISCONNECTED THE CALL.  KC."  [Ex. P.]

5

saying, "Oh, you're at the clinic."  [Manrique Dep. at 128.]  Clarke put Manrique on hold and, when she returned to the line, told him that he needed to speak to his area risk manager, Andrew Berkhemper ("Berkhemper").  [Clarke Dep. at 13, 16.]  She also told Manrique that someone would be calling him but that he should fill out the drug testing center's paperwork in the meantime.  [*See* Manrique Dep. at 128-29.]

Manrique walked up to the front desk and told Kimberly Mitchell ("Mitchell"), the woman working the desk, that he was from J.B. Hunt and that he was there to take a drug test.  [Manrique Dep. at 118-19, 159.]  Mitchell gave Manrique paperwork to fill out and, while Manrique was doing so, someone from J.B. Hunt's Corporate Safety Department called Concentra to cancel his drug test.  [Manrique Dep. at 119, 129-31.]  Manrique overheard Mitchell saying to the person on the phone that Manrique was already there and was filling out paperwork.  [Manrique Dep. at 119, 132-33.]  When Mitchell hung up, she told Manrique that his drug test had been cancelled and that someone would be calling him in the next five to fifteen minutes.  [Manrique Dep. at 119, 133.]  Manrique then called Clarke to ask why his drug test had been cancelled.  [Clarke Dep. at 13.]  Clarke again told him that he needed to speak to his area risk manager.  [Clarke Dep. at 13.]  Clarke testified that, based on what she had been told, Manrique's drug test was cancelled because he "was refusing to go and delaying the process."[13] [Clarke Dep. at 17.]

While Manrique was still at Concentra, someone from J.B. Hunt's Corporate Safety Department—likely Berkhemper—called him and said, "Mr. Manrique, you have been

---

[13] Clarke testified that she was not sure whether it was Berkhemper or Kathy Piha, another J.B. Hunt employee, who cancelled Manrique's drug test that day.  [Clarke Dep. at 15.]  Clarke also testified that Manrique never used the word "refuse"—as in, "I refuse to take the drug test"—but rather, said that "he couldn't go to the drug test."  [Clarke Dep. at 19.]

terminated, because you refused to take a drug test.  That's part of our company's policies."[14] [Manrique Dep. at 119-20, 132; Ex. P.]  Manrique responded, "[L]isten, I didn't refuse to take the drug test.  I am here at the clinic."  [Manrique Dep. at 120.]  The J.B. Hunt representative just replied, "[W]e're sorry, sir, you refused to take the drug test."  [Manrique Dep. at 120.]

Manrique, however, took the drug test anyway and paid for it out of pocket.  [Ex. U attached to Def.'s Mem. of Law ("Ex. U").]  Manrique tested negative for all drugs tested.[15]  [Ex. 4 attached to Leino Decl.]  After taking the drug test, Manrique tried to call his manager, Cheryl Sawula.  [Manrique Dep. at 102, 131; Ex. U.]  Although he was unable to reach her, he told the person who answered the phone that he had been terminated and that he needed to speak to his manager about it.  [Manrique Dep. at 131-32.]

## II.  J.B. Hunt's Post-Termination Actions

On May 8, 2008, J.B. Hunt prepared a "Driver Discipline Form" for Manrique.  [Ex. U.] The form states that Manrique violated company policy and was terminated.  Specifically, the form reads:

> Mr. Manrique was involved with a safety event on Monday May 5th 2008 that required him to take the required DOT drug test.  On Tuesday May 6th he called safety to follow up as to w[h]ere he was to take the test.
>          . . . .
> Refusal to test . . . for a DOT reportable event is automatic termination.
> Mr. Manrique then called back safety yelling that he could not go for the test since his [car] was still [at the] site @ the Elizabeth NJ local yard and he would have to wait for his wife for a ride.  He was told again by safety that he must report to the clinic this morning as required by law.  He said he quit and did not have to take this s_ _ _.  He was going to the labor dept.  He then advised Kim in safety to go F_ _ _ her self.  Kim then disconnected the call once Mr. Manrique became [un]professional.  At noon he called safety again to say he was at the clinic to be tested as.  The clinic was already told that the driver had refused to test.  Mr. Manrique then took it upon himself to get tested and paid out of his pocket.
>          . . . .

---

[14] Clarke testified that she did not know who made the decision to terminate Manrique.  [Clarke Dep. at 20-21.]
[15] Clarke testified that she was not aware that Manrique had passed his drug test.  [Clarke Dep. at 23.]

> Failure to test is automatic termination.
>       . . . .
> Once Mr. Manrique hung up the phone and said he quit the drug test was
> cancelled.

[Ex. U.]  The following day, on May 9, 2008, J.B. Hunt reported to DAC, an employment

records service, that Manrique had been terminated for violating company policy.[16]  [Ex. Q

attached to Def.'s Mem. of Law ("Ex. Q").]  Manrique's DAC Report—an employment report

used in the trucking industry that is available to other major trucking companies—thus states

under "REASON FOR LEAVING," "Discharged (or Company Terminated Lease)," and under

"WORK RECORD," "Company Policy Violation."  [Ex. Q.]

## III.  The Effect of the DAC Report on Manrique's Employment Prospects

After his termination, Manrique attempted to gain full-time employment as a truck driver

with other companies.  [Manrique Aff. ¶¶ 41, 43.]  Because of his DAC Report, however, he was

repeatedly denied employment.  [*See* Manrique Aff. ¶¶ 42, 44.]  Manrique testified that, shortly

after the accident happened, he applied to work for Western Express, a trucking company.

[Manrique Dep. at 56.]  A representative from Western Express, however, told him that, because

of his drug test refusal, he would not be able to work with any major trucking company.

[Manrique Dep. at 56.]  Specifically, this representative told Manrique that her company could

not hire him, that his drug test refusal would be on his DAC Report for the next three years, and

that, consequently, he would be unable to work for any major company for the next three years.

[Manrique Dep. at 58-59.]

The following year, in the summer of 2009, Manrique applied to work for Central

Transport, another trucking company.  [Manrique Dep. at 136.]  The manager of Central

---

[16] J.B. Hunt alleges that it did so in accordance with the Federal Motor Carrier Safety Regulations.  *See* 49 C.F.R. § 382.401(b)(1)(iii) (requiring employers to maintain "[d]ocumentation of refusals to take required alcohol and/or controlled substances tests" for a minimum of five years).

Tranport, however, told Manrique that his DAC Report listed that he had refused a drug test and that this was the reason he could not be hired.  [Manrique Dep. at 134-35, 137-38.]  It was at this point that Manrique requested a copy of his DAC Report, as he could not understand why he was unable to get a job.[17]  [Manrique Dep. at 135, 138-39.]

In the fall of 2009, Manrique called J.B. Hunt's Corporate Safety Department to find out what it meant for his DAC Report to say "Company Policy Violation."[18]  [Ex. Q.]  The J.B. Hunt representative explained to Manrique that this statement on his DAC Report reflected his refusal to take a drug test.  [*See* Manrique Dep. at 141-42.]  Manrique responded that he had never refused a drug test.  [Manrique Dep. at 142.]  Manrique also explained to the representative that J.B. Hunt was affecting his career.  [Manrique Dep. at 142.]  Manrique testified that, by that point in time, things were "super bad"—he was receiving eviction notices, his car had been repossessed, and creditors had started calling him.[19]  [Manrique Dep. at 142.]

## IV.  J.B. Hunt's Policies

Manrique testified that each of the three times he worked for J.B. Hunt, he attended the company's orientation.  [Manrique Dep. at 82, 98.]  And each of these three times, Manrique was

---

[17] After he was terminated by J.B. Hunt, Manrique was only able to get "a few low paying, temporary, casual or cash basis jobs as a truck driver."  [Manrique Aff. ¶ 45.]  According to Manrique, as a result of his termination, he has sustained wage loss since May 6, 2008.  [Manrique Aff. ¶ 46.]  This wage loss has also resulted in Pryor's having to take on additional employment, in the repossession of their car, in the receipt of eviction notices, and in Manrique and Pryor's suffering "inconvenience, stress and anxiety."  [Manrique Aff. ¶¶ 47-50.]

[18] Notably, Manrique's DAC Report does not say anything about a drug test refusal.  [Ex. Q; Manrique Dep. at 142.]  When asked how the manager at Central Transport knew about the drug test refusal, Manrique testified that he believed these trucking companies call each other to find out why a former employee was terminated.  [Manrique Dep. at 142-43.]

[19] When asked what damages he had suffered as a result of the DAC Report, Manrique testified:

> Not able to get a job with all the benefits, since I have a small child, a wife, myself.  My car has been repossessed.  I've been losing a lot of money with all the companies I've been working.  Some of them don't pay or they're trying to pay me the minimum, even with the kind of license that I have.
>
> My wife she has been working double of work that she's been doing.  All the creditors, sooner or later they are going to start suing us.  And a lot of depression and emotional problems.

[Manrique Dep. at 144.]

given J.B. Hunt's Driver Manual.  [*See* Manrique Dep. at 76, 94, 101, 165.]  Page "i" of J.B. Hunt's Driver Manual states: "Neither these rules, policies and benefits, nor any other written or oral statements are contracts of employment, and both the employee and the company understand that employment may be terminated by either at any time, for any reason."  [Ex. I attached to Def.'s Mem. of Law ("Ex I").]   In addition, Chapter 1 of the Driver Manual, entitled "Employment Policies," says that "[t]his manual is not intended to be a contract, nor should it be construed to be a contract of employment" and that, "[j]ust as an employee may resign at any time for any reason, the employee may be terminated by J.B. Hunt at anytime, for any reason." [Ex. J attached to Def.'s Mem. of Law ("Ex. J").]  The Driver Manual also states that J.B. Hunt drivers are expected to "[c]omply with all policies, procedures, and safety rules" and "with all federal, state, and local laws and regulations," and that "failure to meet these standards is cause for concern, discipline and even termination."  [Ex. L attached to Def.'s Mem. of Law ("Ex. L").]  In addition, the Driver Manual states that an employee may be terminated for certain offenses, including (1) "[f]ailure to comply with J.B. Hunt policies and procedures, federal, state or local laws or regulations" and (2) insubordination.  [Ex. O attached to Def.'s Mem. of Law ("Ex. O").]

Each of these three times, Manrique also signed a Certificate of Understanding and Agreement, certifying that he had received a copy of J.B. Hunt's Driver Manual, that he had read and understood its provisions, and that he agreed to follow them.  [*See* Ex. G attached to Def.'s Mem. of Law ("Ex. G").]  This certificate specifically states: "Neither these rules, policies and benefits, nor any other written or oral statements are contracts of employment and both the employee and the Company understand that employment may be terminated by either at any time for any reason."  [Ex. G.]

In addition, each of these three times, Manrique learned about J.B. Hunt's policies regarding drug test refusals.  [Manrique Dep. at 76-78, 82-83, 101-02.]  With respect to these policies, Manrique acknowledged that it was J.B. Hunt's policy that, after an accident occurs, a drug test must be conducted.  [Manrique Dep. at 124.]  It was his understanding that, if a driver was involved in an accident and did not take a drug test, that would be treated as a refusal. [Manrique Dep. at 79.]   As for the specifics of J.B. Hunt's "Substance Abuse/Use Policy," contained in its Driver Manual, this policy states:

> [D]rug and alcohol testing will be used to identify employees in need of counseling, treatment, and disciplinary action.  J.B. Hunt will test for drug use using urinalysis or any other valid testing method allowed and/or required by law (i.e. hair testing) and alcohol use which violates J.B. Hunt policy or any regulation using breath alcohol testing or any valid testing method allowed and/or required by law (i.e. saliva testing).  Drivers will be tested for drug and alcohol use as required by the D.O.T. in the following circumstances: 1.) Pre-employment; 2.) Post-Collision; 3.) Reasonable Suspicion; 4.) Random.
>      . . . .
> <u>Refusal to submit</u> to any tests or any attempts to disrupt or delay the testing process (including not proceeding immediately to the test location or leaving the test site prior to providing an adequate urine or breath sample) will result in denial of employment or termination of present employment. . . .
>
> **<u>Drivers must test immediately upon notification</u>** of the requirement to take any drug or alcohol test.  Immediately is defined as "every action of the employee must lead directly to the completion of the test".  Drivers may not perform any work related activity or engage in any personal activity unless it is essential to getting the test done.  There are no predetermined times in which to report for a test, just that the test must be completed immediately.  Failure to immediately report to the test site for testing or leaving the test site before the test is completed is refusal to test.  Any problems that could possibly delay the test must be reported to Corporate Claims immediately and Corporate Claims will ensure that the problem is resolved so that the driver can test.  This will be accomplished by whatever means that Corporate Claims deems necessary and failure by a driver to report problems to Corporate Claims or to follow the instructions given by Corporate Claims to get the test done will also count as refusal.[20]

[Ex. O.]

---

[20] Manrique acknowledged that the first time a J.B. Hunt employee told him to report for his drug test "immediately" was at 9 a.m. on May 6, 2008, and that he reported to the drug testing center at 11:45 a.m. that same day.  [Manrique Dep. at 126.]

On June 1, 2007, J.B. Hunt's Substance Abuse/Use Policy was revised, but without altering or changing any of the company's previously adopted policies.  [Ex. R attached to Def.'s Mem. of Law ("Ex. R").]   Apart from stating that it does not create an employment contract between the employee and J.B. Hunt and will not be construed as creating any contractual rights or entitlements, this revised Substance Abuse/Use Policy says, in relevant part:

I.     **Policy:**
    A.     **Prohibited Actions and Activities**: . . . J.B. Hunt **will not tolerate** the following actions by its employees and independent contractors:
. . . .
        9.  Any actions taken by the employee or independent contractor that the Safety or Compliance Department may construe as an obstruction of the collection or testing process (as defined in Section I (C) of this policy).
. . . .
    C.     **Refusal to Test**:
        1.  As stated in Section I (A) (9) of this policy, J.B. Hunt will not tolerate any actions taken by an applicant, employee, or independent contractor that the Safety or Compliance Department may construe as an obstruction of the collection or testing process. Additionally, leaving a collection/test site prior to providing an adequate urine or breath sample, failure to immediately report to the collection/test site, refusal to sign testing documents, or any attempts to delay the test will be considered as a refusal. . . . Refusal to test will be considered insubordination and therefore misconduct.
. . . .
        4.  Refusal will result in the denial of an applicant's application, termination of an employee's employment, or termination of an independent contractor's contract.

[Ex. R.]

Another document, revised in November 2005 and titled "Information on the J.B. Hunt Alcohol and Controlled Substance Policies, Procedures, Prohibitions, Consequences of Violations, and Compliance Programs," addresses how J.B. Hunt must comply with the Federal Motor Carrier Safety Regulations ("FMCSR") but how J.B. Hunt's policies can be, and in some cases are, more stringent than these federal regulations.  [Ex. S attached to Def.'s Mem. of Law

("Ex. S").]   Apart from clarifying that it is "not a contract and does not affect the at-will

relationship between J.B. Hunt employee drivers and contract drivers," this document also states:

> VIII.   Refusal to submit to any tests or any attempts to disrupt or delay the
> testing process (including leaving the test site prior to providing an
> adequate urine or breath sample) will result in denial of employment or
> termination of present employment. . . .   Refusal to test will be considered
> insubordination and therefore misconduct. . . .
>
> IX.   According to J.B. Hunt policy, independent of the requirements of the
> FMCSR, violation of any regulation, rule, or policy concerning controlled
> substances or alcohol will result in denial of employment or termination of
> present employment.

[Ex. S.]

Each of the three times Manrique worked for J.B. Hunt, he also signed the company's

Drug/Alcohol Certification Form through which he certified that he had received information on

"the company's policies concerning alcohol and controlled substances possession, use, and

testing."  [Ex. N attached to Def.'s Mem. of Law ("Ex. N").]   This certification also required

Manrique to fill out several multiple-choice questions regarding the company's drug and alcohol

policies.  [Ex. N.]  One of the questions concerned J.B. Hunt's policy that "[r]efusal to submit to

a drug or alcohol test or any conduct that obstructs the collection process will be treated as . . . a

positive test and will result in termination."  [Ex. N.]  Another question addressed the policy that

employees "will be fired if [they] do not report to a collection site immediately when told or if

[they] leave the site before [they] give a good urine and/or breath sample."  [Ex. N.]  And finally,

another question tested the understanding that, "[b]ecause of the dangers of mixing drugs and

alcohol with driving trucks, it is misconduct to violate company drug and alcohol rules."  [Ex.

N.]

Each of the three times Manrique was employed by J.B. Hunt, he also signed a form

entitled "Driver Application – Certifications, Disclaimers, and Acknowledgements."  [Ex. T

attached to Def.'s Mem. of Law ("Ex. T").]  Under a section titled "General Disclaimers," this

form states in relevant part:

> I understand that J.B. Hunt Transport, Inc., hereafter "J.B. Hunt", is under no
> obligation to hire me, that any employment I am offered will not be for any
> specified period of time, that my employment is terminable by either party at will
> with or without notice or cause, and that no representative of J.B. Hunt has
> authority to enter into any agreement with me contrary to the foregoing.  I
> understand that nothing contained in my employment application, or in granting
> of an interview, is intended to create an employment contract between J.B. Hunt
> and myself for either employment or for the providing of any benefit.  I
> understand that none of the benefits or policies in any handbook issued to me by
> J.B. Hunt are intended by reason of its publication to confer any rights or
> privileges to any benefits or policies, or entitle me to remain employed by J.B.
> Hunt, or to change my status as an "at will" employee (as permitted by law).

[Ex. T.]  And under a section titled "Notice of Drug and Alcohol Testing Requirements," the

form states in relevant part:

> I further understand that a confirmed positive drug or alcohol test, or a refusal to
> test, will disqualify me from consideration from employment or will result in my
> termination from employment.  J.B. Hunt will report the results of drug and
> alcohol test results in accordance with regulatory requirements, including release
> to motor carriers and other third parties upon receipt of a properly executed
> release document.

[Ex. T.]

Because Manrique was a local driver, he was also subject to random drug tests.

[Manrique Dep. at 79, 101.]  He had been randomly drug tested on the Friday before the

accident, May 2, 2008, and on the day of the accident, Monday, May 5, 2008.  [Manrique Dep. at

80.]  The drug test that took place on Friday, May 2, 2008 was conducted at Concentra Medical

Center in Elizabeth, New Jersey.  [Manrique Dep. at 81.]

## PROCEDURAL HISTORY

On July 6, 2009, Manrique and Pryor filed a summons with notice to defend against J.B.

Hunt in the Supreme Court of the State of New York, Queens County, alleging "negligence,

defamation, and breach of the duty of good faith and fair dealing in contract" and seeking $1 million in damages.  [DE 1 at 6.]  On September 4, 2009, J.B. Hunt filed a notice of removal under 28 U.S.C. § 1441 on the basis of diversity of citizenship.[21]  [DE 1.]

On September 30, 2009, the plaintiffs filed a complaint and jury trial demand in this Court asserting five counts against J.B. Hunt.  [DE 5.]  In Count 1, the plaintiffs asserted a claim for negligence, stating that, "[o]n or about May 6, 2008, defendant operated its business so carelessly, recklessly and negligently as to cause the cancellation of a drug test of plaintiff, Igor Manrique, and to cause the false and/or inaccurate and/or vague DAC report regarding Igor Manrique."  [DE 5 at 4.]  In Count 2, the plaintiffs asserted that J.B. Hunt had breached the duty of good faith and fair dealing.  [DE 5 at 6.]  In Count 3, the plaintiffs asserted a claim for defamation.  [DE 5 at 8.]  In Count 4, the plaintiffs asserted a claim for intentional, tortious interference with contract.  [DE 5 at 9.]  And in Count 5, the plaintiffs asserted a claim for punitive damages.  [DE 5 at 11.]

On October 15, 2009, J.B. Hunt filed an answer in which it asserted the following affirmative defenses: (1) failure to state a cause of action against J.B. Hunt for which relief can be granted; (2) contributory negligence and assumption of the risk; (3) limitation of liability pursuant to Article 16 of the CPLR; (4) failure to mitigate; (5) that the plaintiffs' statutory rights were not violated; (6) failure to state a claim upon which relief for equitable, compensatory, or punitive damages may be awarded; (7) that J.B. Hunt's employment decisions with respect to Manrique were motivated by legitimate reasons; (8) failure to mitigate / denial of alleged damages; (9) that all injuries and damages complained of by the plaintiffs pre-existed the alleged accident / denial of alleged injuries, damages, and accident; (10) that no conduct by J.B. Hunt

---

[21] Manrique and Pryor are citizens and residents of New York, whereas J.B Hunt is incorporated under the laws of Georgia and has its principal place of business in Arkansas.  [DE 1 at 2.]  In addition, the plaintiffs seek $1 million in damages, which exceeds the amount-in-controversy requirement.  [DE 1 at 1.]

contributed to the plaintiffs' alleged injuries and/or damages; (11) that J.B. Hunt did not terminate Manrique; (12) that the plaintiffs cannot establish that a duty of good faith and fair dealing was required or, if it was, that J.B. Hunt violated this duty; (13) that the plaintiffs cannot establish a claim for defamation; (14) that there was no contract between the parties; (15) that the plaintiffs cannot establish their claim for intentional, tortious interference with contract; (16) that the plaintiffs cannot establish that J.B. Hunt violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.*; and (17) that J.B. Hunt did not violate Manrique's rights. [DE 6 at 11-15.]

On February 21, 2010, the plaintiffs filed an amended complaint, adding HireRight Solutions, Inc. ("HireRight") as a defendant. [DE 12.] As the plaintiffs explained, "HireRight, Inc. is a business that performs various services to other businesses, including providing information to prospective employers about their applicants." [DE 12 at 2.] HireRight "is the owner and operator of the 'DAC' system, which is an information database pertaining to the trucking industry. The DAC system reports on the employment histories and driving histories of truck drivers." [DE 12 at 2.] According to the plaintiffs, the reporting that is contained and distributed through the DAC system is conduct that is within the scope of the FCRA. [DE 12 at 3.] In their amended complaint, the plaintiffs added four additional counts, all of them against HireRight. [DE 12 at 14-20.] In Count 6, the plaintiffs asserted a negligence claim against HireRight. [DE 12 at 14.] In Count 7, the plaintiffs asserted that HireRight violated the FCRA. [DE 12 at 16-17.] In Count 8, the plaintiffs asserted a claim against HireRight for intentional, tortious interference with contract. [DE 12 at 18.] And in Count 9, the plaintiffs asserted against HireRight a claim for punitive damages. [DE 12 at 20.]

On March 23, 2010, J.B. Hunt filed an answer to the amended complaint, which basically mirrored its initial answer. [DE 13.] And on April 27, 2010, HireRight filed an answer to the

16

plaintiffs' amended complaint, asserting twenty-six affirmative defenses.  [DE 21 at 13-17.]  On August 18, 2010, however, the plaintiffs reached a settlement agreement with HireRight.  [DE 26.]  The following month, the parties stipulated to the dismissal of all claims against HireRight [DE 25; DE 27], and on September 8, 2010, all claims against HireRight were dismissed [DE 29].

On March 3, 2011, J.B. Hunt moved for summary judgment, arguing that none of the plaintiffs' claims set forth valid causes of action.  [DE 52-2 at 10.]  On April 1, 2011, the plaintiffs filed an opposition in which they argued that material fact issues exist [DE 56], and on April 11, 2011, J.B. Hunt filed a reply in support of its motion [DE 51-5].  J.B. Hunt inadvertently failed to serve its Rule 56.1 Statement with its motion for summary judgment, but it belatedly served this statement on April 7, 2011.  [DE 51-4.]

On July 19, 2011, the plaintiffs notified me that they had filed for bankruptcy and that this case should, therefore, be stayed, which it consequently was.  [DE 58.]  But on September 22, 2011, the plaintiffs wrote to me saying that, because the bankruptcy debtors are plaintiffs, this case should not be stayed and thus asked that the stay be lifted.  [DE 60.]  The stay was lifted on September 27, 2011.  [DE 61.]  On February 29, 2012, I granted the plaintiffs' motion to change this case's caption, pursuant to the bankruptcy court's order, so as to substitute the Chapter 7 trustee as the named plaintiff.  [DE 62; DE 62-1.]

## DISCUSSION

## I.  Compliance with Local Rule 56.1

Before reaching the merits of J.B. Hunt's summary judgment motion, I pause to consider a procedural issue raised by the plaintiffs.  Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1")

requires a party moving for summary judgment to submit "a separate, short and concise statement" setting forth material facts as to which there is no genuine issue to be tried. Local Rule 56.1(a). This rule further provides that "[f]ailure to submit such a statement may constitute grounds for denial of the motion." *Id.*

Here, when J.B. Hunt filed its summary judgment motion on March 3, 2011, it failed to submit along with it a statement of facts pursuant to Local Rule 56.1(a). On April 1, 2011, the plaintiffs pointed out J.B. Hunt's failure both in their opposition to summary judgment [DE 56 at 2] and in their own statement of facts [DE 55-2 at 1]. Six days later, on April 7, 2011, J.B. Hunt served its Rule 56.1 Statement of Facts, acknowledging in a letter to the plaintiffs that it had inadvertently failed to do so earlier. [DE 51-4.] J.B. Hunt also stated in this letter that it would not oppose the plaintiffs' serving an Amended Counterstatement of Uncontested Material Facts. [DE 51-4.] The plaintiffs subsequently filed a letter requesting that I disallow J.B. Hunt's belatedly served statement of material facts, deny J.B. Hunt's motion for summary judgment, and sanction J.B. Hunt under Fed. R. Civ. P. 11.

Although it is true that "[a] district court is justified in denying a motion for summary judgment for failing to comply with this rule," *Gilani v. GNOC Corp.*, No. 04-CV-2935, 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006), the Second Circuit has made clear that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). In *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325 (E.D.N.Y. 2006), for example, the defendants failed to attach to their notice of motion a statement of facts pursuant to Local Rule 56.1(a). *Id.* at 332. Soon after the plaintiff pointed out this failure in her own Rule 56.1 Statement, however, the defendants submitted a Rule 56.1 Statement. *Id.* In exercising its broad discretion, the district

18

court refrained from denying the defendants' summary judgment motion based on this technical failure "because defendants promptly cured the error once it was brought to their attention, and plaintiff[] ha[s] not alleged that [she] suffered any prejudice from the initial defect." *Id.*; *see also Thaler v. Casella*, 960 F. Supp. 691, 697 (S.D.N.Y. 1997) (declining to deny defendants' summary judgment motion when defendants failed to submit statement of facts with their initial motion but subsequently served it with their reply). "[E]ven if defendants had not submitted the supplemental statement," the court went on, "the relevant facts were readily apparent from the facts section of the memorandum of law, and so plaintiff could not have been prejudiced." *Ostroski*, 443 F. Supp. 2d at 333; *cf. Williams v. R.H. Donnelley Inc.*, 199 F. Supp. 2d 172, 173 n.1 (S.D.N.Y. 2002) (excusing the plaintiff's failure to submit a Rule 56.1 Statement and deeming the facts set forth in her memorandum of law sufficient to satisfy Rule 56.1 to the extent she otherwise complied with the rule).

Here, J.B. Hunt served its Rule 56.1 Statement within days of the plaintiffs' raising the issue. In addition, the facts included in J.B. Hunt's untimely-served Rule 56.1 Statement were all included in its summary judgment motion—either in the Facts or Argument section—so they came as no surprise to the plaintiffs. The plaintiffs were thus not prejudiced in any way by the delayed submission of J.B. Hunt's statement of facts. In addition, the plaintiffs could have, but did not, seek leave to file an Amended Counterstatement of Material Facts, despite knowing that J.B. Hunt would not have opposed such a request. There is, therefore, no reason to deny J.B. Hunt's motion for summary judgment because of this procedural mishap.

## II.  Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  And a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

"The burden of demonstrating that no material fact exists lies with the moving party."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (per curiam).  "If the movant satisfies this initial burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of fact exists."  *Edsell v. Indep. Freightway, Inc.*, No. 94-CV-227, 1995 WL 375827, at *3 (N.D.N.Y. June 16, 1995), *aff'd*, 101 F.3d 681 (2d Cir. 1996).  Summary judgment is mandated, however, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  And, in ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed," *Anderson*, 477 U.S. at 255, and "[a]ll ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam).

## III.  Negligence (Count 1)

In their complaint, the plaintiffs argue that J.B. Hunt was negligent in making the statements it made to DAC—namely, that Manrique was terminated for violating company

policy—and in thus contributing to Manrique's "false and/or inaccurate and/or vague DAC report." [DE 12 at 6.] In their opposition, the plaintiffs elaborate that J.B. Hunt "failed to act carefully with regard to stating the exact facts as to what happened after the accident, failed to report that the drug test was passed, and failed to report that the company interfered with the test by canceling it." [Pls.' Mem. of Law 6.] The plaintiffs claim that, because of J.B. Hunt's negligence, they have suffered, among other things, loss of employment and income, damage to reputation, and emotional distress. [DE 12 at 8.]

This claim, however, sounds in defamation rather than in negligence. *See Colon v. City of Rochester*, 762 N.Y.S.2d 749, 752 (N.Y. App. Div. 2003) ("A defamation cause of action is not transformed into one for negligence merely by casting it as such." (internal quotation marks and alterations omitted)). As New York courts have made clear, when a "plaintiff alleges an injury to his reputation as a result of statements made or contributed to by defendants, plaintiff is relegated to whatever remedy he might have under the law of defamation and cannot recover under principles of negligence." *Id.*; *see also Butler v. Delaware Otsego Corp.*, 610 N.Y.S.2d 664, 665 (N.Y. App. Div. 1994). Summary judgment is thus granted to J.B. Hunt on the plaintiffs' negligence claim.[22] The plaintiffs' defamation claim is, however, addressed below.

## IV. Breach of the Duty of Good Faith and Fair Dealing (Count 2)

The plaintiffs assert that J.B. Hunt breached the duty of good faith and fair dealing when it cancelled Manrique's drug test, harassed Manrique about the drug test, and made false,

---

[22] In support of their negligence claim, the plaintiffs reference a provision of the FCRA, 15 U.S.C. §1681s-2(a), which provides that "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." [Pls.' Mem. of Law 6-7.] Setting aside whether this federal statute applies to the case at hand, it is worth noting that there is no private right of action for a violation of Section 1681s-2(a). *Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 427 (S.D.N.Y. 2010). Rather, this provision can be enforced exclusively by government officials. *Id.*; *see also Moore v. U.S. Dep't of Educ.*, No. 11-865-cv, 2011 WL 5903689, at *1 n.1 (2d Cir. Nov. 28, 2011) (recognizing that, "[w]hile this court has not addressed the issue, a number of our sister circuits as well as district courts in this circuit have . . . concluded that 15 U.S.C. § 1681s-2(a) affords no private right of action").

inaccurate, and/or vague reports to DAC.  [DE 12 at 9.]  The plaintiffs also contend that Manrique and J.B. Hunt were parties to an employment contract.  [DE 12 at 9.]

In New York, "[a]bsent an agreement establishing a fixed duration, an employment is presumed to be a hiring at will, terminable at any time by either party for any or no cause." *Robertazzi v. Cunningham*, 742 N.Y.S.2d 115, 116 (N.Y. App. Div. 2002) (internal quotation marks omitted).  It is also "well established that there is no implied obligation of good faith and fair dealing in an employment at will."  *Id.*; *see also Freedman v. Pearlman*, 706 N.Y.S.2d 405, 409 (N.Y. App. Div. 2000) (citing *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86 (N.Y. 1983)) (holding that there is no implied contractual obligation of good faith and fair dealing when employment is at will).

Here, it is beyond dispute that Manrique's employment with J.B. Hunt was at will and was, therefore, terminable by either party at any time for any reason.  This was made clear in numerous policies and documents that Manrique was given (and signed) in each of the three orientations he attended.  Specifically, the J.B. Hunt Driver Manual states that "[n]either these rules, policies and benefits, nor any other written or oral statements are contracts of employment, and both the employee and the company understand that employment may be terminated by either at any time, for any reason" [Ex. I], that "[t]his manual is not intended to be a contract, nor should it be construed to be a contract of employment," and that, "[j]ust as an employee may resign at any time for any reason, the employee may be terminated by J.B. Hunt at anytime, for any reason" [Ex. J].  The Certificate of Understanding and Agreement also says that "[n]either these rules, policies and benefits, nor any other written or oral statements are contracts of employment and both the employee and the Company understand that employment may be terminated by either at any time for any reason."  [Ex. G.]  J.B. Hunt's revised Substance

22

Abuse/Use Policy also states that it does not create an employment contract between the employee and J.B. Hunt and that it will not be construed as creating any contractual rights or entitlements.  [Ex. R.]  The document titled "Information on the J.B. Hunt Alcohol and Controlled Substance Policies, Procedures, Prohibitions, Consequences of Violations, and Compliance Programs" similarly says that it is not a contract and does not affect the at-will employment relationship between J.B. Hunt and its drivers.  [Ex. S.]  And finally, the form entitled "Driver Application – Certifications, Disclaimers, and Acknowledgements" states that "nothing contained in [an] employment application . . . is intended to create an employment contract between J.B. Hunt and [an employee] for either employment or for the providing of any benefit" and that "none of the benefits or policies in any handbook issued to [an employee] by J.B. Hunt . . . entitle [that employee] to remain employed by J.B. Hunt, or to change [his] status as an 'at will' employee (as permitted by law)."  [Ex. T.]  Thus, because Manrique's employment with J.B. Hunt was at will, J.B. Hunt owed him no implied duty of good faith and fair dealing and was, therefore, unable to breach this duty.  Summary judgment is granted to J.B. Hunt on this claim.

**V. Defamation (Count 3)**

In support of their defamation claim, the plaintiffs assert that J.B. Hunt made false statements about Manrique—namely, that he violated company policy—that such statements were published to third parties (DAC) without privilege or authorization, that J.B. Hunt was negligent in making these statements, and that Manrique sustained harm and damages to his person, property, and business as a result of such statements or, in the alternative, that these statements constitute defamation per se because they relate to Manrique's professional character and standing.  [DE 12 at 10.]  Under New York law, the four elements of defamation are: "(1) a false statement, (2) publication without privilege or authorization to a third party, (3) by at least a

negligence standard of fault and (4) the statement either causes special damages or constitutes defamation per se."  *Pub. Relations Soc'y of Am., Inc. v. Rd. Runner High Speed Online*, 799 N.Y.S.2d 847, 850 (N.Y. Sup. Ct. 2005).

With respect to the first element, there is a genuine dispute of material fact regarding whether Manrique actually violated J.B. Hunt's Substance Abuse/Use Policy, which states that "[**d**]**rivers must test immediately upon notification** of the requirement to take any drug or alcohol test."  [Ex. O.]  And "[f]ailure to immediately report to the test site for testing . . . is refusal to test," with "immediately" defined as "every action of the employee must lead directly to the completion of the test."  [Ex. O.]  Although on the night of the accident, Manrique was informed, through his wife, that he needed to be drug tested the following morning, it was at roughly 9 a.m. on May 6, 2008 that Manrique was first told that he had to be drug tested "immediately."  It is true that Manrique did not leave his house for the testing center the very second he was informed that he needed to be tested "immediately."

Nevertheless, he endeavored to get the location of his drug test changed—given his lack of transportation, his lack of sleep, and his having been on medication—and asked if he could wait until his wife got home from work so that she could drive him to New Jersey.  In this light, a jury could reasonably find—despite the inappropriate language Manrique used—that his sole focus was on completing the drug test and that his actions were all efforts to overcome the obstacles he faced in getting to the distant testing site.  Specifically, a Google Maps search reveals that it takes approximately 1.5 hours to get from Jackson Heights, where Manrique lived, to Jersey City, where Concentra was located, using public transportation. http://maps.google.com/ (last visited Mar. 30, 2012).  Because Manrique arrived in Jersey City at

11:45 a.m., two and three-quarters hours after he had been directed to do so, his efforts to overcome the obstacles he faced took, at most, an hour and fifteen minutes.

Nevertheless, despite the genuine issue of fact that exists with respect to the truth or falsity of the statements J.B. Hunt made to DAC, J.B. Hunt asserts that it is entitled to judgment as a matter of law because its statements to DAC were protected by a qualified privilege.  [Def.'s Mem. of Law 14.]   Under New York law, where a statement is qualifiedly privileged, the plaintiff has the burden of proving that the privilege was abused.  N.Y. Pattern Jury Instr.-Civil § 3:32 (2d ed. 2008).  As the New York Pattern Jury Instructions aptly summarize the law, "[a] privilege can be abused in one of two ways.  First, the privilege is abused if defendant made the statement solely because of ill will or personal spite toward the plaintiff. . . . Second, the privilege is abused if defendant made the statement with a reckless disregard for the statement's truth or falsity.  Reckless disregard means that defendant entertained serious doubts as to the truth of the statement or made the statement with a high degree of awareness that it was probably false."  *Id.*

Particularly apposite is *Edsell v. Independent Freightway, Inc.*, No. 94-CV-227, 1995 WL 375827 (N.D.N.Y. June 16, 1995), *aff'd*, 101 F.3d 681 (2d Cir. 1996), where Judge Pooler granted summary judgment to the defendant employer on a plaintiff truck driver's defamation claim.  *Id.* at *6.  She did so on the ground that the defendant employer had a qualified privilege to report to DAC Services the reason for the plaintiff's termination.  *Id.* at *5.  As Judge Pooler explained, "[b]oth parties had an interest and duty to exchange driver safety information, and this relationship was memorialized in their subscription agreement."  *Id.*; *see also id.* ("[The defendant] and DAC Services had a common interest in the provision of driver safety reports.").

Moreover, she also found that the plaintiff had failed to prove that the defendant had abused its qualified privilege. *Id.* at *6.

Here, the record contains support for the argument that J.B. Hunt entertained a reasonable belief in the truthfulness of its representation to DAC that Manrique had violated the company policy requiring him to "immediately" get drug tested. Webster's Third New International Dictionary (1981) defines the word "immediately" as "without interval of time: without delay: STRAIGHTWAY." *Id.* at 1129. The cases defining the term vary from the dictionary definition to definitions which are less literal and encompass the concept of a reasonable amount of time. 20 Words & Phrases 162-65 (Perm. ed. 1959). Nevertheless, the language of J.B. Hunt's Substance Abuse/Use Policy—"every action of the employee must lead directly to the completion of the test"—is consistent with the dictionary definition. Under these circumstances, J.B. Hunt may have a reasonable basis for summary judgment on the issue of whether it acted with the requisite degree of malice.

I need not resolve this issue at this point because of the absence of a fully developed record going to the issue of whether the statement at issue was qualifiedly privileged. Unlike in *Edsell*, where the district court had before it the subscription contract between the employer and DAC Services, J.B. Hunt has not made that document part of the record, and I do not feel comfortable basing a decision on qualified privilege upon a summary of a subscription contract in a seventeen-year-old case. Moreover, the DAC Report in the present case is not entirely clear as to the purpose of the report and does not say anything about the agreement between J.B. Hunt and DAC. Unlike *Edsell*, which emphasized the mutual interest the employer and DAC Services had in "driver safety information" and in "the provision of driver safety reports," the report of Manrique's termination for a company policy violation does not on its face appear to relate to

such information.  On the contrary, in support of its motion for summary judgment, J.B. Hunt claims that the policies that Manrique violated included its "anti-subordination and anti-harassment policies."[23]  [Def.'s Reply 4.]

Under these circumstances, I deny J.B. Hunt's motion for summary judgment as to the plaintiffs' defamation cause of action, without prejudice to renewal with a properly supported motion.  Such a motion should also contain an affidavit by the J.B. Hunt employee who made the decision to submit the information regarding Manrique's termination to DAC on May 9, 2008. [*See* Ex. Q.]  The affidavit should also address that individual's understanding of the company policy that Manrique violated and how exactly Manrique violated that policy.

## VI.  Tortious Interference with Contract (Count 4)

The plaintiffs contend that J.B. Hunt is liable for intentional, tortious interference with contract.   In support of this contention, the plaintiffs assert that, after he was terminated, Manrique sought employment with other trucking companies; that J.B. Hunt knew or should have known that Manrique would be looking for employment with companies privy to his DAC Report; and that J.B. Hunt interfered with Manrique's efforts to gain employment as a truck driver by making false, inaccurate, or vague reports to DAC.  [DE 12 at 11-12; *see also* Pls.' Mem. of Law 9.]

In New York, the elements of a claim for tortious interference with contract are: "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages."  *Chung v. Wang*, 912 N.Y.S.2d 647, 648 (N.Y. App. Div. 2010).  Here, the plaintiffs have failed to prove the existence of a valid, existing contract

---

[23] J.B. Hunt does not point to any evidence that, prior to this litigation, it deemed Manrique to have violated these other two policies.

between Manrique and a third party—specifically, a third-party trucking company to whom Manrique's DAC Report was available—let alone J.B. Hunt's knowledge of that contract and intentional procurement of the third party's breach of it.  Because the plaintiffs' claim seems to address an alleged interference with a *prospective* employment contract, which Manrique was unable to secure, it sounds more like a claim for tortious interference with a prospective business relationship, the elements of which are: "(1) the defendant's knowledge of a business relationship between the plaintiff and a third party; (2) the defendant's intentional interference with the relationship; (3) that the defendant acted by the use of wrongful means or with the sole purpose of malice; and (4) resulting injury to the business relationship."  *534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick*, 935 N.Y.S.2d 23, 24 (N.Y. App. Div. 2011).  Not having raised this claim, however, the plaintiffs have failed to prove any of its elements.  Summary judgment is thus granted on the plaintiffs' tortious interference with contract claim.

## CONCLUSION

J.B. Hunt's motion for summary judgment is granted with respect to the plaintiffs' first, second, and fourth claims, and is denied with respect to the plaintiffs' third claim for defamation.

SO ORDERED.

Brooklyn, New York
March 30, 2012

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge